UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

        Plaintiff,

v.

                                Criminal No. 15-20262

Charles Albert Walker,

        Defendant.

_____/

**OPINION AND ORDER**
**DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS (D.E. No. 32)**

    In this action, Defendants Charles Albert Defendant (D1) ("Defendant") and Cortez Deonte Moultrie (D2) ("Moultrie") (collectively, "Defendants") are charged with bank robbery and firearms offenses. The matter is currently before the Court on Defendant's Motion to Suppress Statements, wherein he contends that he was not adequately apprised of his constitutional rights under *Miranda*,[1] and additionally, that any incriminating statements given by him were involuntary products of coercion.

    The Court held an evidentiary hearing and entertained oral argument as to the motion on January 22, 2016. For the reasons set forth below, the Court shall DENY Defendant's Motion to Suppress Statements.

**BACKGROUND**

    In the superceding Indictment entered on October 22, 2015, Defendants are charged with three counts of Bank Robbery; Aid and Abet, in violation of 18 U.S.C. §§ 2113(a), (e) and 2; and

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

three counts of Brandish, Use and Carry Firearms During and in Relation to a Crime of Violence; Aid and Abet, in violation of 18 U.S.C. §§ 924(c). The Indictment also includes forfeiture allegations. These charges follow incriminating statements made by Defendant during interrogations after his arrest on April 20, 2015.

**Defendant's Motion To Suppress Evidence**

On September 17, 2015, Defendant filed the present Motion to Suppress Statements. (D.E. No. 32). In it, Defendant asks the Court to suppress statements made by him to law enforcement officials during post-arrest interrogations because: 1) Defendant was never properly apprised of his *Miranda* rights and therefore he could not have knowingly and voluntarily waived them; and because 2) Defendant's statements were elicited by coercion and implied promises of benefit or leniency, thereby rendering the statements involuntary.

The Government opposes the motion, asserting that Defendant's custodial statements were properly obtained during both interrogations.

**Evidentiary Hearing**

With the issues so framed by the parties, this Court held an evidentiary hearing, and heard oral argument, on January 22, 2016. The Government presented three witnesses at the hearing: 1) Detective Christopher Fraser, of the Macomb County Sheriff's Office; 2) Detective Joseph Marougi, of the Oakland County Sheriff's Office; and 3) Sergeant Todd Hunt, of the Oakland County Sheriff's Office.

The Government also submitted into evidence: 1) Government's Exhibit A: Macomb County Sheriff's Office Case Report Supplement; 2) Government's Exhibit B: DVD video/audio recording, Interview #1; 3) Government's Exhibit C: Macomb County Sheriff Department

2

Witness Statement, dated April 20, 2015 and signed by Defendant; 4) Government's Exhibit D: DVD video/audio recording, Interview #2; and 5) Government's Exhibit E: Macomb County Sheriff Department Witness Statement, dated April 20, 2015 and signed by Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having observed the evidence and the witnesses who testified at the evidentiary hearing, allowing for this Court to assess credibility, having considered the arguments presented by counsel, and having applied the governing legal principles, the Court makes the following findings of fact and conclusions of law.[2]

### Findings Of Fact

On April 20, 2015, Christopher Fraser ("Fraser") was called to the scene of a bank robbery investigation. Fraser is a detective with the Macomb County Sheriff's office. He has been employed by the Sheriff's office for approximately 13 years. He is currently assigned to Gang and Violent Crimes Task Force.

Fraser responded to a pursuit of a vehicle suspected to be driven by the individuals who had just robbed Huntington Bank. Upon arriving to the scene, Fraser initially assisted to ensure that the other officers were secure. Fraser observed Defendant being escorted to a patrol vehicle in handcuffs. At that point in time, Fraser introduced himself to Defendant and asked Defendant for his name. Defendant then began making statements. Fraser immediately advised Defendant of his *Miranda* rights by reading them off of his *Miranda* card, which is issued by the Prosecuting Attorney's office in Macomb County. While still on the side of the road, and after

---

[2] To the extent that a finding of fact is more properly a conclusion of law, and to the extent that a conclusion of law is more properly a finding of fact, it should be so construed.

Defendant was read his rights, Fraser asked him a couple of brief questions. After inquiring about any weapons, Fraser explained to Defendant that he would be transported to the Macomb County Sheriff's office, where they could sit down and speak.

**Interview #1**

Upon his arrival, Defendant was placed in an interview room. Fraser removed Defendant's handcuffs. Before any questioning commenced, Fraser pulled out a small card and read Defendant his rights:

Fraser:      I know I read you your *Miranda* rights while we were out there, but I just want to read them to you again, okay?

Defendant:   no problem.

Fraser:      and then we'll, ah, you know, like we talked about out there, we'll, we'll have a chat, you know. Obviously I'd like to know what your intentions were. You know, I don't think it was...

Defendant:   bad.

Fraser:      ... evil. But, whatever, you know, I don't know yet.

Defendant:   Hey, how much time am I looking at?

Fraser:      Alright. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk a lawyer and have him present with you during questioning. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. If you decide at any time to exercise these rights and not answer any questions or make any statements. Basically what that means is you can stop at any time you want. Okay? Do you understand each of these rights that I have explained to you? Do you?

Defendant:   yes sir.

Fraser:      okay. And having these rights in mind, do you still wish to talk to us now?

Defendant:   Yeah, I'll talk to you.

4

Fraser:         Alright.

(Ex. B: DVD at 5:18).

After this, Fraser began questioning Defendant about the bank robbery that led to his

arrest that day.  Defendant then made several incriminating statements regarding his involvement

in the robbery.  Approximately 18 minutes into questioning, and after Fraser essentially

implicated himself and his co-defendant, Defendant inquired as to his prison exposure:

Defendant:      can I ask you? Am I looking at a long time?

Fraser:         you know, I don't like to sit here in this chair and tell you because I don't
know.  I really don't.  It's always up to the judge.  It's always up to, you
know, your past history. I don't have your criminal history printed out so I
couldn't tell you. I know you said your name is clean, but you know, I
don't know if you've ever been arrested before or anything.

Defendant:      I've been arrested before for home invasion, but I didn't do it and I end up
taking that to trial to fight it.

Fraser:         right, right.

Defendant:      (Unintelligible)

Fraser:         and you don't have anything pending against you right now?

Defendant:      oh, I might have, I just got pulled over cause I got, I had a car had some
lights and sounds and the police stopped me, because, when I got to pump
my gas, the guy in the car turned it on.  You know when you turn your
radio on?

Fraser:         yeah, yeah.

Defendant:      and the bass hit while they was riding right past me. So they stopped me
and gave me a ticket.

Fraser:         um, alright.

Defendant:      that's the only thing I got pending.

Fraser:         alright.

5

Defendant:      but other than that, I'm clean as a whistle.

(Ex. B: DVD at 18:30).

At that point, Defendant asked Fraser if he could call his wife. Fraser agreed.

Fraser:         do you want something to drink or something?

Defendant:      I think I want to call my wife.

Fraser:         okay, we can do that, we can do that.

Defendant:      I just want to call her and just let her know I'm in trouble.

Fraser:         I'm not gonna be able to let you talk to her for too long, but...

Defendant:      alright.

Fraser:         ... we can probably do something like that, alright.

Defendant:      alright.

Fraser:         this is a witness statement form, okay? Or a statement from. Alright? It's pretty self explanatory at the top, you know, and if, ah, you want to fill this out, you know, tell your side of the story cause the other people are going to read this. Okay? Prosecutors and everybody else that goes in your file. Alright? So however you want to write it, you don't have to if you don't want to, but a lot of times people like to write in their own words. You know, was going on and intentions and things like that. Okay? Obviously I can't tell you what to write, but that's something that is your option. Okay?

Defendant:      Is it any chance of me getting bonded out of here or no?

Fraser:         today?

Defendant:      I know it ain't going to be today.

Fraser:         you ain't going nowhere today.

Defendant:      yeah, I know that.

Fraser:         you're going to see a judge tomorrow, okay. And then they're going to set a bond. It's up to the judge.

. . . .

Fraser:    I don't know what they're going to set. You know, that's not our decision. I mean obviously, my role is at the end of it, I find all the facts, I talk to you, I talk to Tez. You know, we put everything together and then the judge makes that decision as far as any bond or anything like that, okay? I don't like to be a liar so I'm not going to sit here and blow smoke up your ass and tell you, yeah you're going to get this, you're going to get that.

Fraser:    I, I, I, don't know. Alright, so, um, but like I said, as far as this goes, that's ah, if you want to fill that out in your own words what happened, what you know, whatever. That's, I can't, again, I can't tell you what to write, but, tops self-explanatory and then if you need more pages, there's more pages here. You sure you don't need a water or anything?

Defendant:    yeah, I'll take one.

Fraser:    alright.

Defendant:    I'm gonna sit on my knees and do this too.

Fraser:    alright, yeah, if you want to that's fine.

(Ex. B: DVD at 20:30). After this exchange, Defendant proceeded to write his statement. A

couple of minutes later, Fraser walked back in and provided Defendant with some water.

Defendant informed Fraser that he was not quite sure what to say:

Fraser:    you know, like I said man, some people use it as an opportunity like uh, a letter of apology. Some people look at it like, hey man, this is what I was gonna do. You know, it just, you know, cause obviously people are going to read that and never talk to you.

Defendant:    right, right.

Fraser:    so, but again, it's up to you if you, you know, if you don't want to write it, you don't have to.

Defendant:    I'm gonna write something, man. I gotta write something so... I gotta get there, I got to be with them kids.

7

(Ex. B: DVD at 24:45).  Fraser then left Defendant for several minutes so as to provide him with an opportunity to finish the statement.  Upon his return, Fraser questioned Defendant about any prior robberies.  Defendant denied any prior robberies.  Defendant and Fraser proceeded to discuss some of Defendant's tattoos.  Defendant then asked if he can use the phone.  Fraser agreed, dialed Defendant's wife on his cell phone and put the phone on speaker.  Defendant's conversation was brief - he informed her that he was in trouble.  The conversation ended.  Fraser asked nothing further of Defendant and the interrogation concluded.

**Interview #2**

Defendant was taken back to the same interrogation room at 7:46 p.m., approximately 8 hours after his first interrogation.  There, he was met by Hunt and Marougi.  Hunt and Marougi were called out to the Macomb County Sheriff's office because they received information regarding the bank robbery that had taken place that day, and they intended to interview the individual being held there.

Todd Hunt is a Sergeant with the Oakland County Sheriff's Department.  He has been employed by the Oakland County Sheriff's Department for approximately four and a half years.  Prior to his employment with Oakland County, Hunt was employed by the city of Pontiac Police Department.  Hunt worked for the city of Pontiac for approximately 24 years.  Hunt is currently assigned to the FBI Violent Gang Task Force.  Joseph Marougi is a Sergeant with the Oakland County Sheriff's Department.  He has been employed by the Sheriff's Department for approximately four and a half years.  Prior to being employed with Oakland County, he worked as a police officer for the city of Pontiac for approximately 18 years.  Marougi is currently assigned to the FBI Violent Gang Task Force.

Before questioning commenced, Hunt reminded Defendant of the prior *Miranda*

warnings he received that day:

| | |
|---|---|
| Hunt: | But, before we talk to you, you know I mean they've already *Mirandized* you.  They've already stressed to you what we want to stress to you, that if you don't want to talk to us you don't have to. |
| Defendant: | no, that's okay, I feel good. |
| Hunt: | We just want to let you know, you know... |
| Marougi: | those rights still apply and if you're good with that we want to roll with what we got and talk to you about what we got on our half. |
| Defendant: | okay. |
| Hunt: | so, at any time if you don't want to talk to us just let us know.  If you just don't want. Like a certain question you don't want to answer... |
| Defendant: | like a no comment or something. |
| Hunt: | yeah... |
| Defendant: | Okay. |
| Hunt: | that's fine. |
| Defendant: | alright, yeah. |
| Hunt: | okay. |

(Ex. D: DVD at 1:00).  Hunt proceeded to explain the reason why they were there.  The

conversation centered on past robberies that they believed Defendant was involved in.

| | |
|---|---|
| Hunt: | the reason we are here, obviously, is because we want to talk to you a little bit about what happened today and a little bit about what's happened in the past. |
| . . . . | |
| Hunt: | we know that you guys did this, right.  What we want to talk to you is that we also know that back in March you guys did one in Pontiac the one at |

9

the Huntington bank... off Perry.  We want to talk to you about this incident.  We want to just go ahead and wrap this up and close this off so we can all move forward.  Um, the reason we want to talk to you and the reason we came out here is because obviously on paper, on paper it doesn't look good, right?  I mean, you know, they're scared.  We need to talk to you to find out when this is going on, what your intentions are.  Are your intentions to shoot people, to kill people?  My guess is no.  Um, but that's why we're here.  We want to talk to you, we want to go ahead and clear these things up.  Get all these in the past and then we can move forward.

Marougi:      because you've been honest up front already, alright.  So I mean, you got a bad chapter in your life right now that you had, so lets close that chapter with everything so it doesn't haunt you back later.  You know, it is what it is.  Shit popped off, you guys did stupid stuff.  For whatever reason, we're not here to blame you or nothing.  You probably got a family...

Defendant:    yeah, four kids and a wife.

Marougi:      four kids and a wife ain't cheap...

. . . .

Marougi:      so we're not painting you, don't feel like we're painting you as a monster.  We're not.  The monsters are the ones that paint themselves as monsters and don't man up to the shit that they do... People later on understand, alright, we feel why you did this and what you did it for instead of thinking, this guy is a straight up dick.  Excuse my language, I tend to talk street...

Defendant:    right, right.  You keeping it real.  Yeah.

Marougi:      I was born and raised that way.  So people look at them and think, man they're fucking ass holes, or people look at them and think, man I sympathize for this guy.  He got it tough, he's trying to do what he's doing.  He ain't killing nobody.  He ain't murdering nobody.  Yeah, he's done some bad shit with guns, scaring the fuck out of people when doing it.  But, he ain't hurting nobody.  The bottom line is you ain't hurting nobody.  Anything you take can be replaced.  Paper is paper, money is money.  These mother-fuckers print it faster than we can spend it.  Unless you're at the dice tables, then it goes faster than they print that shit.  So, that's just what we're here for.  So, lets get all of this closed out so you don't got to worry about nothing later on coming back to bite you in the

10

> ass. Consequences are consequences and everything is going to have to deal with what happened...

(Ex. D: DVD at 1:29). Defendant was then asked about a bank robbery that took place in

Pontiac:

> Marougi:   we know you're familiar with that bank and everything that happened earlier was identical. Alright, so we're going to listen to you about that and why it happened and why you did it. And we'll ask you questions to fill in our blanks.

(Ex. D: DVD at 5:00). Defendant provided additional details beyond his first interrogation

statements. Defendant admitted that both he and his co-defendant robbed the Huntington

National Bank in Pontiac. He explained his intent and what had transpired when they entered

the bank. Defendant admitted that it was his idea to rob the bank. Before the conversation

continued, Defendant asked about potential charges and punishment.

> Defendant:   before I go on, before you all go on, can I ask one question?
>
> Hunt:   yeah.
>
> Defendant:   as my family is going, they, they going crazy. I know my kids they just found out too. I just talked to my wife.
>
> Hunt:   yeah.
>
> Defendant:   am I looking at a long, long time?
>
> Marougi:   it's not up to us man.
>
> Hunt:   It isn't up to us, but one thing we want to do is we have the bank's side of the story. What we want to do, we obviously have to give this to the prosecutors. What we want to do is if we can get your side of the story then we at least have something to balance it a little bit. This is to humanize it.
>
> Defendant:   okay.
>
> Hunt:   so instead of just two, two guys with bandanas on their face come in and

11

|  |  |
|---|---|
|  | put everyone on the ground, you know, they're terrified, right? |
| Defendant: | yeah. |
| Hunt: | you have someone come in.  Listen, I'm a family man, I'm just trying to get by.  Trying to get money.  Well I mean that goes a long way, right? |
| Defendant: | right. |
| Hunt: | it goes a long way for someone to see that this isn't someone that planned on it.  I mean if it's the truth, I mean of course if it's not the truth we need to know.  If you did plan on hurting them, then that's something we'd want to know. |
| Defendant: | if I wanted to hurt them I could have just did it. You know what I'm saying? It's that simple, but I... |
| Hunt: | so, so we know your family is worried.  And if there is something later that we need to contact them then we will talk to you about that.  But that's basically it's not our call on what happens at the end of it, but we do know that if we can get both sides of the story then, then, our mission is to get the truth out there.  Not just to railroad someone. Not just to lock someone up.  But if we can get the truth out there then obviously that's our role in this.  Then what we do is go to the prosecutors and they say that this is the deal, this is the whole package.  Not just their perspective on it. |
| Defendant: | right. |
| Hunt: | so, so the answer to your question is what happens long run we don't know, but we know that we can, maybe we can control what happens just right now.  And then we'll get to that point and then we'll of course if you need us to contact your family or something we can do that.  I mean it's not a good answer. |
| Defendant: | yeah, I know that. |
| Hunt: | but sometimes this is the toughest part, it's the beginning, it's the most stressful part, but here in a couple days it's going to start clear up. |

(Ex. D: DVD at 8:10).  Defendant then continued to discuss details of the robbery in Pontiac.

About ten minutes later, Defendant was asked about another bank robbery that occurred in

Brownstown:

| | |
|---|---|
| Hunt: | alright, Charles. We got to talk to you about one more. |
| Marougi: | and I got to commend you dog, for doing the right thing. It's tough, you're doing it, you're cleaning the slate. Alright, so.. |
| Defendant: | I just want to be able to know if I can get back to my family, you know. I know, I know... (unintelligible murmur). |
| Hunt or Marougi: | Well, that's why you're here... |
| Marougi: | We'll tell them that you're being a good guy, man.  That's a fact... because they ask us all the time how are these guys? |

(Ex. D: DVD at 18:30). Defendant eventually admitted to being involved in a bank robbery in

Brownstown at Keystone Bank.  Defendant provided the officers with details of the robbery.

Toward the conclusion of the interrogation, Marougi suggested that, if it was something

Defendant was interested in, he could write an apology letter to the people at the bank:

| | |
|---|---|
| Marougi: | do you want to write an apology letter to these people? We'll give them to the tellers. |
| Defendant: | I don't know if that's going to help me, though. |
| Marougi: | it's an apology letter, dog. You never know how people feel about that shit. |
| Defendant: | cause I mean, I ain't really... |
| Marougi: | I mean you ain't even gotta write nothing, I'm just saying.  Because people can actually see it and feel it and see that he meant it. |
| Defendant: | yeah... |
| Marougi: | you know, just I'm sorry. I don't want to tell you what to write.  You can write whatever you want if you feel like writing it.  If you don't want to write it, I'm good with it. |
| Defendant: | I'll write something, man. But I just don't-  man, my kids, though. |

13

(Ex. D: DVD at 36:15).  Defendant was given time to write his statement and the interrogation concluded.

## Conclusions of Law

### I.   Defendant Was Clearly and Unequivocally Apprised Of His Constitutional Rights

"The Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966) that a suspect subject to a custodial interrogation must first be given notice of his or her right against self-incrimination."  *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003).  Prior to questioning an individual who is in police custody, law enforcement officers must reasonably inform the individual of his rights as required by *Miranda*.  *Florida v. Powell*, 559 U.S. 50, 60-61 (2010).  *Miranda* prescribed the following four warnings:

> [A suspect] must be warned prior to any questioning [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford any attorney one will be appointed for him prior to any questioning if he so desires.

*Treesh v. Bagley*, 612 F.3d 424, 429 (6th Cir. 2010) (quoting *Miranda*, 384 U.S. at 479).

Defendant contends that Fraser's hasty recital of the *Miranda* rights was incomprehensible and did not give Defendant sufficient time to fully comprehend the nature of his rights and the consequences abandoning them.  Defendant additionally contends that Fraser inaccurately summarized Defendant's *Miranda* rights when he stated that, "basically what that means is that you can stop at any time."

Based on the Court's review of the audio/video recordings, and credible testimony of detective Fraser and Sergeants Hunt and Marougi, the Court finds that Defendant was appropriately apprised of his Constitutional rights.  The video/audio record makes clear that

14

Defendant was read his rights upon arrest and then again upon commencement of questioning. Upon my review of the recording, Fraser's recital was clear and provided Defendant with a reasonable understanding of his rights at that time.  *See U.S. v. Crumpton*, 88 F.Supp.3d 796 (E.D. Mich. 2015) (in determining whether a law enforcement officer adequately conveyed the *Miranda* warnings, a court's inquiry focuses on whether the warnings reasonably conveyed to the suspect his rights as required by Miranda.).  Additionally, the "inaccurate" statement Defendant takes issue with seems to be taken out of context.  The following exchange transpired between Defendant and Fraser at the start of the interrogation:

> Fraser:     I know I read you your Miranda rights while we were out there, but I just want to read them to you again, okay?
>
> Defendant:  no problem.
>
> Fraser:     and then we'll, ah, you know, like we talked about out there, we'll, we'll have a chat, you know.  Obviously I'd like to know what your intentions were. You know, I don't think it was...
>
> Defendant:  bad.
>
> Fraser:     ... evil. But, whatever, you know, I don't know yet.
>
> Defendant:  Hey, how much time am I looking at?
>
> Fraser:     Alright. You have the right to remain silent.  Anything you say can and will be used against you in a court of law.  You have the right to talk a lawyer and have him present with you during questioning.  If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish.  **If you decide at any time to exercise these rights and not answer any questions or make any statements. Basically what that means is you can stop at any time you want**. Okay?  Do you understand each of these rights that I have explained to you? Do you?
>
> Defendant:  yes sir.
>
> Fraser:     okay. And having these rights in mind, do you still wish to talk to us now?

Defendant:      Yeah, I'll talk to you.

To the extent that Defendant argues he was not properly apprised of his rights under Miranda, this Court shall DENY Defendant's Motion to Suppress.

### A)      Did Defendant Knowingly And Voluntarily Waive His Rights?

Since the video/audio record makes clear that Defendant was read his rights, the Court must determine whether or not he knowingly and voluntarily waived them.

An individual may waive his rights, "provided the waiver is made voluntarily, knowingly, and intelligently." *Id.* at 444.  This inquiry has two distinct dimensions: (1) "the relinquishment of the right must have been voluntarily in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception; and (2) the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). It is the Government's burden to prove, by a preponderance of the evidence, that Defendant's waiver was knowing, voluntary, and intelligent. *Colorado v. Connelly*, 479 U.S. 157, 167-68 (1986).  To determine whether a waiver of *Miranda* rights is valid, the court examines the totality of the circumstances. *U.S. v. Ray*, 803 F.3d 244, 266 (6th Cir. 2015).

Defendant contends that he was not aware of the nature of his rights and that he did not appreciate the consequences of abandoning these rights because Fraser's recital was hasty and unclear.  Additionally, Defendant contends that he was never given a copy of his rights and he never signed a *Miranda* Waiver Form.

The inquiry here is not "whether the defendant knew and understood every possible consequence of a waiver," but, instead, "whether he knew that he could choose not to talk to law

enforcement officers, to talk only with counsel present, or to discontinue talking at any time."
*U.S. v. Lawrence*, 735 F.3d 385, 436-37 (6th Cir. 2013) (quoting *Garner v. Mitchell*, 557 F.3d
257, 261 (6th Cir. 2009)).

Here, as evinced by the recording, Fraser's recital of the *Miranda* warnings were clear
and easy to understand.  Defendant indicated that he understood the rights as they were read to
him.  With these rights in mind, Defendant was still willing to speak to Fraser.

Based on the video/audio record, the Court finds that Defendant knowingly, voluntarily,
and intelligently waived his rights under *Miranda*.  The Court shall DENY Defendant's Motion
to Suppress to the extent that it argues that Defendant did not voluntarily waive his *Miranda*
rights.

## II.     Hunt and Marougi Were Not Required To Re-Advise Defendant Of His *Miranda* Rights Prior To Questioning Because Defendant's Earlier Miranda Rights Were Not Stale By The Time The Second Interrogation Took Place

Next, Defendant contends that even if Fraser properly apprised him of his constitutional
rights during his first interrogation, these warnings were stale by the time of Defendant's second
interrogation.  As such, Defendant argues that his statements were obtained in violation of the
Fifth Amendment and must be suppressed.

The Government may not use a custodial statement against a defendant unless, prior to
being questioned, the defendant was warned of his rights under *Miranda*.  *People v. Harris*, 261
Mich. App. 44, 55 (2004).  "The police are not, however, required to readvise a defendant of his
*Miranda* rights in every subsequent interview."  *Id.* at 6 (citations omitted).  The Sixth Circuit
has not adopted a per se rule as to when a suspect must be re-advised of his *Miranda* rights after
a passage of time or a change in questioners.  *United States v. Weekley*, 130 F.3d 747, 751 (6th

Cir. 1997).  Additionally, the mere passage of time does not necessarily dictate that police must give fresh warnings.  *U.S. v. Jones*, 147 F.Supp. 2d 752, 761 (E.D. Mich. 2001).  The Court applies a totality of the circumstances test when determining whether a delay in questioning necessitates a formal re-reading of *Miranda*.  The  Court's determination centers on the following two questions:

> (1) whether the defendant knew and understood his rights at the time the *Miranda* warning was given by interrogators, and

> (2) whether anything happened between the warnings and Defendant's inculpatory statements, including the passage of time or any other intervening event, that rendered Defendant unable to fully consider the effect of an exercise or waiver of those rights before speaking with police.

*Id.* at 761 (citing *United States v. Vasquez*, 889 F. Supp. 171, 177 (M.D. Pa. 1995)).

With respect to the first determination, the video/audio record demonstrates that Defendant understood his rights under *Miranda* when Fraser first advised him of them during the initial interrogation.

The second inquiry will depend on whether or not the interruption in the continuity of the interrogation rendered Defendant's earlier warnings stale by the time of the second interrogation. The list of factors that a court can consider in making this determination is not exhaustive. Some of the factors the Court may consider are: (1) the amount of time that has elapsed between the warnings and the statements; (2) the substance of the *Mirandized* interrogation compared to the subsequent interrogation; (3) whether the defendant initiated the interview; (4) whether there were subsequent reminders after the initial warning and waiver; and (5) whether the interrogation occurred in the same or in a different location.  *U.S. v. Morris*, No. 13-00086(1), 2013 WL 3867836 (S.D. Ohio July 25, 2013) (citing *Treesh v. Bagley*, 612 F.3d 424, 432 (6th

18

Cir. 2010)); *U.S. v. White*, 68 F. App'x 535, 538 (6th Cir. 2003); *Weekley*, 130 F.3d at 751;

*United States v. Square*, 790 F. Supp. 2d 626, 653 (N.D. Ohio 2011); *Jones*, 147 F. Supp. 2d at

761-62).

Defendant compares the circumstances of this case with the circumstances in *Jones* and

*Morris*.[3]  In both cases, the court suppressed statements made by a defendant during a

subsequent interrogation because the court determined that the earlier *Miranda* warnings were

stale.  However the facts in *Jones* and *Morris* can be distinguished from the facts present here.

In *Jones*, more than 18 hours had passed between the defendant's *Miranda* warnings and the

subsequent interrogation.  *Jones*, 147 F. Supp. 2d at 761.  There was a change in location

between the first interrogation and the second.  *Id.*  The officer who conducted the second

interrogation was not the same officer who administered the *Miranda* warnings during the first

interrogation.  *Id.* at 762.  The court concluded that these factors "militate toward the conclusion

that Defendant could not fully appreciate a waiver of his Miranda rights" when he spoke to the

second agent during the subsequent interrogation.  *Id.*  In *Morris*, four days had passed between

the defendant's *Miranda* warnings and the subsequent interrogation.  *Morris*, 2013 WL 3867836

at *3.  During the four-day period between the defendant's warnings and second interrogation,

the defendant was transferred to different facilities twice.  *Id.* at *4.  The substance and duration

of the first interrogation differed significantly from the second interrogation.  *Id.*  Moreover, the

defendant was unaware that the second interrogation was being secretly recorded.  *Id.*  Finally,

the defendant was not even summarily reminded of his rights or that he had previously waived

---

[3] *U.S. v. Jones*, 147 F. Supp.2d 752 (E.D. Mich. 2001); *U.S. v. Morris*, No. 13-00086(1), 2013 WL 3867836 (S.D. Ohio July 25, 2013).

19

these rights.  *Id.* at *3.

Here, Defendant's second interrogation occurred approximately eight hours after he was initially questioned and read his *Miranda* rights.  Although time, on its own, is not outcome-determinative, it is " a factor that can exacerbate or diminish other factors under the circumstances."  *Id.* at *3.  Unlike the defendants in both *Jones* and *Morris*, Defendant was questioned within the same day that his *Miranda* rights were read.  Also unlike the defendants in *Jones* and *Morris*, Defendant remained at the jail and was not transferred to another location in the interim.  Defendant's second interrogation occurred in the same interrogation room as the first.  Although Hunt and Marougi were not the same officers that initially questioned and *Mirandized* Defendant, this fact, on its own, is not enough to have affected Defendant's understanding of the rights read to him eight hours prior.  Before any questioning took place, Defendant was reminded of the *Miranda* rights he was read earlier and he was informed that those rights still applied.  Moreover, Defendant was informed that he was under no obligation to answer any questions.  The above factors do not weigh in Defendant's favor.

Defendant's argument that the subject matter of the subsequent interrogation differed greatly from Defendants' first interrogation is not completely without merit.  During Defendant's first interrogation, he was questioned about the bank robbery that took place earlier that day in Harrison Township.  The second interrogation mainly centered on two bank robberies that had occurred months prior.  However, the fact that Defendant was questioned about similar robberies in the past does not establish that Defendant no longer appreciated the consequences of waiving his rights.  During Defendant's first interrogation, he was asked about prior bank robberies, but he denied any  involvement.  At the start of the second interrogation, Hunt and Marougi pointed

20

out that the robbery that took place in Harrison Township was nearly identical to an earlier robbery that took place in Pontiac. Defendant was informed that questioning would relate to the robbery that occurred that day as well robberies that took place in the past. The duration of the second interrogation was approximately one hour, only 15 minutes longer than the Defendant's first interrogation. Again, before he was questioned, Defendant was reminded of his earlier *Miranda* rights and was advised that he was under no obligation to answer any questions.

Based on the totality of the circumstances, nothing seriously changed for Defendant between the time he was read his *Miranda* rights to the time of his subsequent interrogation so as to necessitate a formal re-reading of these rights. This Court shall DENY Defendant's Motion to Suppress Statements to the extent that it argues that Defendant was not properly re-apprised of his rights under *Miranda*.

### III.   Defendant's Statements To Law Enforcement Officials Were Not Elicited By Coercion And Implied Promises of Leniency

In addition to the above, Defendant argues that his statements were involuntary products of coercion and implied promises of leniency. As such, Defendant contends that his statements are inadmissible.

The Fifth Amendment bars the admission of involuntary statements or confessions. *Taylor v. Ludwick*, No. 8-11823, 2009 WL 3462542 (E.D. Mich. Oct. 22, 2009) (citing *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986)). "When a defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary." *United States v. Johnson*, 351 F.3d 254, 260 (6th Cir. 2003) (citations omitted) (internal quotation marks omitted). A confession is involuntary if: (1) the police extorted the confession by means of coercive activity; (2) the coercion in question was

sufficient to overbear the will of the accused; and (3) the will of the accused was in fact overborne 'because of the coercive police activity in question.'" *Holland v. Rivard*, 9 F. Supp.3d 773, 787 (E.D. Mich. 2014) (quoting *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988)). Ultimately, the Court must determine "whether, under the totality of circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." *Id.* (quoting *Miller v. Fenton*, 474 U.S. 104, 112 (1985)). Relevant factors to consider include, but are not limited to: 1) the presence or absence of police coercion ('a crucial element'); 2) the length, location, and continuity of the interrogation; 3) the suspect's physical condition and mental health; and 4) whether the suspect was advised of his Miranda rights. *Id.* at 788-89 (citing *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993)). Generally, promises of leniency are coercive only "if they are broken or illusory." *Johnson*, 351 F.3d at 262 n. 1. "[A] statement about possible leniency upon cooperation is not generally impermissible." *United States v. Wiley*, 132 F. App'x 635, 640 (6th Cir. 2005) (citations omitted). Similarly, "'speculation that cooperation will have a positive effect' do[es] not make subsequent statements involuntary." *United States v. Delaney*, 443 F. App'x 122, 129 (6th Cir. 2011).

Defendant argues that his statements were coerced because: (1) Fraser allegedly withheld communication to Defendant's wife until after Defendant offered a written confession; (2) Fraser made promises of leniency by allegedly implying that incriminating statements would benefit Defendant and result in a more lenient sentence; and (3) Hunt and Marougi made implied promises of leniency when they allegedly advised Defendant that getting his side of the story would "humanize" the circumstances and that it would "go a long way."

The argument that Fraser coercively delayed communication to Defendant's wife until

22

after Defendant provided written confession is not persuasive.  Initially, the Court notes that

Fraser's conduct during Defendant's interrogation was not objectively coercive. Defendant's

first interrogation lasted approximately 45 minutes.  The interrogation took place in an

interrogation room, where Defendant appeared relaxed.  Fraser removed Defendant's handcuffs

and Defendant was not restrained in any way.  Before questioning, Fraser asked if Defendant

needed any medical attention.  At one point, Fraser offered and retrieved water for Defendant.

These factors suggest that no coercion took place.  Although Defendant was not afforded an

opportunity to speak to his wife until after a written statement was completed, the video/audio

record demonstrates that the phone call to Defendant's wife was not conditioned upon

Defendant's written statement.  Fraser advised Defendant numerous times that the decision to

write the statement was his.  Additionally, the recording makes clear that by the time Defendant

requested to speak to his wife, he had already confessed to his involvement in the bank robbery

that led to his arrest.  Thus, even if the Court finds that Fraser delayed communication, there is

no basis under which the Court could find that Defendant's confession was the result of

misconduct or coercion.

Defendant's argument that Fraser made implied promises of leniency is also not very

persuasive.  Defendant argues that when Fraser told Defendant "that the witness statement form

was an opportunity for [Defendant] to tell his side of the story to the prosecutor and the judge[,]"

Fraser was essentially "impl[ying] that making incriminating statements would benefit

[Defendant] and result in a more lenient sentence."  (Def.'s Br. at 16).  However, as discussed

above, Defendant's witness statement form was completed after Defendant had confessed to his

involvement in the bank robbery.  Defendant's statement contained no incriminating fact in

addition to what Defendant had already confessed.  Additionally, even if Defendant's statement contained additional incriminating facts, Fraser's statements were not implied promises of leniency.  Fraser's statement that the form would provide Defendant an opportunity to tell his side of the story to the prosecutors and the judge was truthful.  This statement did not imply that Defendant would not be charged with a crime or that he would be charged with a lesser crime. Fraser repeatedly informed Defendant that the ultimate decision-maker here was the judge. Fraser explained that he did not have the authority to make charging and sentencing determinations. Fraser's admitted role was to "find all the facts."

Finally, Defendant's argument that Hunt and Marougi made implied promises of leniency is also unsupported by the video/audio record.  Defendant contends that Hunt implied that Defendant could expect benefits as well as lenient treatment by the prosecution if he confessed. Specifically at issue are Hunt's statements that getting Defendant's side of the story would provide them with an opportunity to "balance" the scales and "humanize" the circumstances, and that an explanation of Defendant's intent and version of events could go a long way.  (Def.'s Br. at 17).  A consideration of the totality of the circumstances does not support the conclusion that these statements amounted to coercive promises of leniency.  Hunt's statements were truthful in that Defendant's side of the story would in fact provide the prosecution with a more balanced version of the events.  Additionally, Defendant ignores statements made in conjunction with the statements at issue here, where Hunt and Marougi explain that the ultimate decision as to what happened to Defendant is not theirs to make.  Hunt clarified to Defendant that his "mission was to get the truth out there."  Additionally, by the time these statements were made, Defendant had already confessed to the robbery that had occurred in Pontiac.  Ultimately, the video/audio

24

record demonstrates that neither Hunt or Marougi implied that Defendant would be charged with a lesser crime.

To the extent that it argues that his statements were elicited by improper promises of benefit and leniency, this Court shall DENY Defendant's Motion to Suppress.

**CONCLUSION**

For the reasons set forth above, IT IS ORDERED that Defendant's Motion to Suppress Statements (D.E. No. 32) is DENIED.

**IT IS SO ORDERED**.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: February 1, 2016

I hereby certify that a copy of the foregoing document was served upon counsel of record on February 1, 2016, by electronic and/or ordinary mail.

S/Jennifer McCoy
Case Manager

25
